UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **JACQUELINE L. SMITH** | * | **CIVIL ACTION NO.  11-0053** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Jacqueline L. Smith protectively filed the instant application for Title II Disability Insurance Benefits on February 14, 2008.  (Tr. 82-86, 93).  She alleged disability as of December 20, 2007, because of lupus, severe fibromyalgia, neuropathy, sleep apnea, osteoarthritis, rheumatoid arthritis, restless leg syndrome, diabetes, hypertension, hypothyroidism, mitrovalve prolapse, heart murmur, bilateral carpal tunnel syndrome, right knee replacement, and left knee replacement – necessary.  (Tr. 93, 96).  The claim was denied at the initial stage of the administrative process.  (Tr. 40-45).  Thereafter, Smith requested and received a September 9, 2009, hearing before an Administrative Law Judge ("ALJ").  (Tr. 31-39).  However, in a February 5, 2010, written decision, the ALJ determined that Smith was not disabled under the Act, finding at Step Four of the sequential evaluation process that she was able to return to her

past relevant work as an admissions clerk and an administrative coordinator.  (Tr. 11-19).  Smith appealed the adverse decision to the Appeals Council.  On November 18, 2010, however, the Appeals Council denied Smith's request for review; thus the ALJ's decision became the final decision of the Commissioner.  (Tr. 2-4).

On January 19, 2011, Smith sought review before this court.  Succinctly restated, she contends, for a variety of reasons, that the ALJ's residual functional capacity assessment is not supported by substantial evidence.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards.  *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program

throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)  An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)  An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)   An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)  If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)  If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Analysis

### I. Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that Smith had not engaged in substantial gainful activity during the relevant period. (Tr. 13). At step two, he found that she suffers severe impairments of status post right knee replacement, Pickwickian syndrome (sleep apnea), fibromyalgia, left shoulder bursitis, cervical spondylosis, sarcoidosis, and obesity. *Id*. He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 15).

### II. Residual Functional Capacity

The ALJ next determined that Smith retains the residual functional capacity to perform the full range of sedentary work. (Tr. 16).[1] Plaintiff challenges the sufficiency of the ALJ's

---

[1] Sedentary work entails:
> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing

residual functional capacity assessment on the grounds that the ALJ improperly discounted the findings of the consultative physician, and instead independently derived plaintiff's residual functional capacity.  Plaintiff also contends that the ALJ's residual functional capacity assessment is undermined by new evidence that she presented to the Appeals Council.

1)      Medical Chronology

Plaintiff's medical history is complex, with a multitude of disease processes.  Because Smith alleges disability as of December 20, 2007, the court's non-exhaustive recitation of plaintiff's medical treatment is limited to records that shed light on her condition beginning on that date.

On December 13, 2007, Smith asked her physician to complete her medical leave forms because she intended to appeal her employer's decision to terminate her employment.  (Tr. 197). At that time, she had complaints of increased pain, fibromyalgia, and chronic pain.  *Id*.

On January 7, 2008, Smith underwent an overnight CPAP/BIPAP Titration Sleep Study, which resulted in a diagnosis of Pickwickian syndrome that appeared to be adequately corrected with BIPAP of 16/12.  (Tr. 193).

On January 11, 2008, Smith returned to her orthopedist, Scott McClelland, M.D. for follow-up.  (Tr. 464).  McClelland noted that he had last seen Smith several years earlier to remove a loose body caused by avascular necrosis.  *Id*.  Smith reported that she had been trying to live with her symptoms, but it had gotten to the point where her quality of life was severely impaired.  *Id*. Accordingly, she was ready to proceed with a total right knee replacement.  *Id*. McClelland told Smith to expect to be off of work for eight weeks.  *Id*.

Smith was hospitalized from January 16-22, 2008, for her right knee replacement.  *See*

---

are required occasionally and other sedentary criteria are met.
20 C.F.R. 404.1567(a).

Tr. 242-243  On January 16, 2008, Dr. McClelland wrote that Smith suffered from severe right knee pain stemming from avascular necrosis, rheumatoid arthritis, and degenerative changes. (Tr. 224-227).  Conservative treatment had not been successful; therefore, he was admitting her for total right knee replacement.  *Id*.  The January 17, 2008, operative report noted diagnoses for severe arthritis of the right knee and avascular necrosis of the right knee.  (Tr. 228-230).

Postoperatively, Smith experienced some problems with sedation, pain relief, and mild anemia.  (Tr. 191-192, 231-234).  She was diagnosed with osteoarthritis of the right knee, status post right total knee replacement; hypertension; diabetes, and obesity.  *Id*.

On January 17, 2008, Smith was seen by Michael Lawson, M.D., for a consultation.  (Tr. 235-239).  He diagnosed post-operative, total right knee replacement; lupus; rheumatoid arthritis, stable; hypertension, well-controlled; diet-controlled diabetes mellitus; obstructive sleep apnea on CPAP; fibromyalgia; multiple chronic pain complaints, on methadone therapy; and restless leg syndrome.  *Id*.

On January 18, 2008, Smith's rheumatologist, John E. Hull, M.D., wrote that he was following Smith for connective tissue disease and sarcoidosis, which was well-controlled on Methotrexate IM.  (Tr. 240-241).  She also had fibromyalgia ; a chronic pain process; restless leg problems, and thyroid replacement.  *Id*.  She had experienced worsening knee pain for a considerable period of time.  *Id*.

On February 18, 2008, Smith reported to McClelland that she was feeling 100% better after her surgery. (Tr. 462).  Her wound was well-healed, and she had a normal gait.  *Id*.

On March 13, 2008, Smith's physical therapist, Anjel Liles, wrote that she had treated Smith on two occasions, once for several weeks in September 2007, and then again after a total knee replacement surgery on January 16, 2008.  (Tr. 209).  Liles wrote that because of Smith's other medical problems, Smith had taken longer to heal than usual.  *Id*.  She stated that Smith

6

was not ready to return to her past job description, and it was not known when, or if she would reach that point. *Id*. She added that the stressors that Smith faced in the work environment only worsened her medical conditions and decreased her functional independence. *Id*. Consequently, Liles believed that Smith was an acceptable candidate for disability. *Id*.

Physical therapy progress notes from March 19, 2008, indicate that Smith's limitations included severe anxiety, decreased range of motion, and pain. (Tr. 269-270). Smith's perception of pain was greater than reality, which slowed down the healing process. *Id*. She was ambulating independently. *Id*. On March 27, 2008, Smith was discharged from physical therapy. (Tr. 274-275).

On April 3, 2008, Dr. McClelland noted that Smith had undergone a total knee replacement in January, and was doing fairly well. (Tr. 244-247). Two days earlier, however, she had noticed a new pain in the proximal incision region. *Id*. She exhibited some mild tenderness about the joint. *Id*. McClelland felt that it was a stitch abscess. *Id*. Accordingly, he planned to admit her to undergo a formal incision and drainage to evaluate the extent of the problem. *Id*. He also intended to aspirate the joint at another location well away from the spot. *Id*.

Physical therapy notes from April 21, 2008, document that Smith had been referred back to physical therapy because her incision had become very sensitive to the touch. (Tr. 276-278). At that time, she could walk 300 feet on even terrain, with no assistive device. *Id*. She could walk 100 feet on uneven terrain. *Id*. She could climb one step, with difficulty. *Id*. Moreover, she remained incapable of performing specific work activity secondary to pain or limitation. *Id*. Her right knee pain was 2/10 at rest and 4/10 with activity. *Id*.

On April 24, 2008, Smith showed up 45 minutes late for her appointment, and had not been exercising. (Tr. 283-284). The next day, Smith was discharged from physical therapy. (Tr.

287-289). At that time, she was able to ambulate on even terrain for 300 feet. *Id*. She could climb but one step. *Id*. She still was unable to perform specific work activity, secondary to pain or limitation. *Id*. She had a functional, albeit reduced, range of motion of the right knee. *Id*.

On June 3, 2009, Dr. Hull wrote that Smith's case was complex, with arthralgias that had responded to methotrexate. (Tr. 431). She also suffered from a concomitant fibromyalgia process that was treated with Lyrica and methadone. *Id*. On July 31, 2008, Hull opined that in all likelihood, Smith would obtain social security disability, which, he believed, could adversely affect her medicaid eligibility. (Tr. 437).

On June 23, 2008, Smith presented to Dr. McClelland with some anterior lateral knee pain. (Tr. 396). At that time, she ambulated with a normal gait. *Id*. McClelland thought that it would take time for her to progressively improve. *Id*.

On July 9, 2008, Smith returned for physical therapy. (Tr. 291-293). She could walk 50 feet, without an assistive device, and could climb three steps. *Id*. She ambulated with an antalgic gait pattern on the right, versus the left. *Id*.

On August 4, 2008, Dr. McClelland diagnosed Smith with left hip greater trochanter bursitis. (Tr. 395). Smith again saw Dr. McClelland on August 28, 2008, after she injured her right knee following a fall. (Tr. 394). She said that her knee gave out. *Id*. McClelland diagnosed a contusion that should heal well. *Id*.

Smith continued with physical therapy through September and October 2008. *See e.g.*, 317-330.

On December 16, 2008, Smith presented to a physician's assistant associated with Dr. McClelland complaining of right knee pain, left shoulder pain, left neck pain, and left hand numbness. (Tr. 392-393). She had suffered reduced range of motion since the abscess surgery in April 2008. *Id*. Smith complained of intermittent knee pain. *Id*. She was reluctant to undergo

8

another carpal tunnel release. *Id*.

A December 19, 2008, MRI of the cervical spine showed minimal, diffuse cervical spondylosis with slight bulges, but no significant cord or nerve root impingement. (Tr. 402).

In a December 23, 2008, progress note, Dr. Hull again noted that Smith was a complex patient with sarcoidosis; some restrictive lung disease; inflammatory arthropathy; gastropathy; restless leg syndrome; hypothyrodism, with thyroid nodule; and chronic pain process on methadone and Lyrica. (Tr. 436).

On December 30, 2008, Smith received another referral to physical therapy because of her right knee pain. (Tr. 332-333). At that time, she could walk 150 feet on even terrain, and climb three steps. *Id*.

Dr. McClelland's progress notes from January 29, 2009, state that Smith's primary pain in her left arm was her shoulder. (Tr. 390-391). She reported that her fingers stayed numb all of the time. *Id*. On physical examination, she had diminished sensation to light touch to the left thumb, index, long and radial ring fingers. *Id*. She also had a positive Tinel's and Phalen's signs at the wrist, but no motor atrophy. *Id*. She exhibited a positive impingement sign in the left shoulder. *Id*. An MRI scan showed diffuse cervical spondylosis with slight bulges, but no significant neurologic compression. *Id*. A shoulder MRI revealed probable glenohumeral joint arthritis with an effusion, edema, and thickening along the superior margin of the subscapular and rotator cuff interval with tendinosis about the anterior margin of the supraspinatus. *Id*. Clinically, McClelland thought that Smith had impingement type findings, with bursitis in the left shoulder. *Id*. With regard to her left side carpal tunnel, McClelland did not think that anything short of a carpal tunnel release would prove effective. *Id*.

On January 30, 2009, Smith reported to her physical therapist that she would have to have surgery on her left hand for carpal tunnel and that she had fluid in her shoulder. (Tr. 350). Smith

was discharged from physical therapy on April 27, 2009. (Tr. 360-361). At that time she could walk 150 feet with difficulty and climb three steps. *Id*.

On April 2, 2009, Smith was noted to have diagnoses for rheumatoid arthritis, osteoarthritis, osteoporosis, diabetes mellitus, hypertension, back pain, cervicalgia, gout, hyperlipidemia, carpal tunnel syndrome, thyroid, and sarcoidosis. (Tr. 434). She received Kenalog and Toradol injections on May 14, July 30, and September 2, 2009. (Tr. 429-430, 433).

On September 11, 2009, Dr. Hull noted that Smith was not doing well. (Tr. 498, 530). She had some numbness and tingling in her feet, and was not sleeping well. *Id*.

On November 11, 2009, Smith underwent right knee arthroscopy. (Tr. 515-516). She was diagnosed with probable scar, soft tissue impingement. *Id*.

Phillip Madonia, M.D. examined Smith on November 21, 2009, at the request of disability determination services. (Tr. 500-503). He noted that Smith was independent with her activities of daily living. *Id*. However, she ambulated with the assistance of crutches. *Id*. Upon examination, there was no muscle asymmetry, atrophy, or involuntary movements. *Id*. However, she did have decreased range of motion in the knees. *Id*. She refused to bend her lumbar spine. *Id*. Smith exhibited an antalgic gait, with the assistance of crutches. *Id*. She was unable to bend or squat. *Id*. She exhibited 5/5 grip strength, with adequate fine motor movements, dexterity, and ability to grasp objects bilaterally. *Id*. She did not appear depressed or anxious. *Id*. She had good tone and 5/5 strength bilaterally in all muscle groups. *Id*.

Madonia diagnosed lupus, degenerative joint disease of the bilateral knees, hypertension, fibromyalgia, hypothyroidism, obstructive sleep apnea, and obesity. *Id*. He noted that, objectively, she ambulated with crutches because of her bilateral knee pain, and that the crutches were medically necessary. *Id*. Her hand function was quite normal. *Id*. Based upon the examination, Madonia opined that Smith should be able to sit for an entire workday. *Id*.

However, she would not be able to walk and/or stand during a workday, and her ability to lift/carry objects would be limited by her use of crutches. *Id*.

Madonia also completed a medical source statement indicating that Smith could occasionally and frequently lift less than ten pounds, and stand and/or walk for less than two hours in an eight hour workday. (Tr. 504-507). Her ability to sit was not impaired. *Id*. He explained that Smith had degenerative joint disease in her bilateral knees that required her to ambulate with crutches, which, in turn, impaired her ability to stand and walk and lift and carry objects. *Id*. He further indicated that Smith could never climb, balance, kneel, crouch, crawl, or stoop. *Id*.

On November 24, 2009, Dr. McClelland noted that Smith's knee felt great, and that she only had minimal soreness from the portal sites. (Tr. 513). Smith reported that her knee felt better than it had in a long time. *Id*. McClelland stated that Smith could weight-bear, as tolerated. *Id*.

A December 21, 2009, echocardiogram revealed mild concentric left ventricular hypertrophy, normal left ventricular systolic and diastolic function, with an estimated LVEF of 60-65%, minimal mitral and tricuspid valve regurgitations, and at least mild pulmonary hypertension. (Tr. 552).

    2)    <u>Discussion</u>

Quoting Social Security Ruling 96-8p, the Fifth Circuit has observed that,

> a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and nonexertional factors.

11

> Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (citations and internal quotation marks omitted).[2]

At the time of the ALJ's decision, Dr. Madonia was the only physician of record to issue a function by function opinion regarding the effects of plaintiff's multiple impairments. Nonetheless, the ALJ accorded little weight to Dr. Madonia's opinion because it appeared to be premised upon Smith's use of crutches. (Tr. 17). The ALJ emphasized that just three days after Dr. Madonia's examination, Smith reported to Dr. McClelland that her knee felt great. Indeed, if Dr. Madonia was not aware that Smith had undergone right knee arthroscopy only two weeks earlier, such that her need for crutches was potentially transitory, he may have reached a different conclusion regarding her limitations.

However, even if the ALJ articulated a potentially valid rationale for discounting Dr. Madonia's opinion, the remaining record does not provide substantial evidence to support the ALJ's residual functional capacity assessment. After he discarded the opinion of the consultative physician, there is no indication that the ALJ attempted to contact plaintiff's treating physicians, Drs. McClelland and Hull, to obtain their impressions regarding the longitudinal impact of Smith's impairments. Instead, the ALJ cited some benign physical examination findings, and then autonomously concluded that plaintiff's impairments would be accommodated by a residual functional capacity for the full range of sedentary work. (Tr. 17).

The court emphasizes that the lack of a medical source statement describing the types of

---

[2] Although Social Security Rulings are not binding on the federal courts, *Myers, supra*, they are "binding on all components of the Social Security Administration. 20 C.F.R. § 402.35 (b)(1).

12

work that the claimant is still capable of performing does not, in, and of itself, render the record incomplete. *Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995). In *Ripley*, as here, the Commissioner argued that the medical evidence substantially supported the ALJ's decision. *Ripley, supra*. The Commissioner pointed to medical reports discussing the extent of plaintiff's injuries, including a four year history of back troubles. *Id*. However, without reports from qualified medical experts, the Fifth Circuit could not conclude that the evidence substantially supported the ALJ's residual functional capacity assessment because the court was unable to determine the "effects of [plaintiff's] conditions, no matter how 'small.'" *Id*. The only evidence that described plaintiff's ability to work was plaintiff's own testimony, which, when read in proper context, failed to support the ALJ's residual functional capacity assessment. *Id*.

The instant case is materially indistinguishable from *Ripley, supra*. The record is devoid of a medical source statement that supports a residual functional capacity for the full range of sedentary work. Moreover, plaintiff's own testimony was not consistent with an exertional capacity for sedentary work. *See e.g.*, Tr. 38, 97, 147. Also, the physical therapist recognized walking and climbing limitations that do not appear consistent with the full range of sedentary work. *See* discussion, *supra*.[3] Under these circumstances, the court is compelled to find that the ALJ's assessment is not supported by substantial evidence. *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions"); *Ripley, supra* (substantial evidence lacking where: no medical assessment of claimant's residual functional

---

[3] While physical therapists and chiropractors are not considered "acceptable" medical sources under the regulations, and therefore, cannot establish the *existence of a medically determinable impairment*, the Commissioner still may use evidence from these sources to assess the severity of an impairment and how it affects the claimant's ability to work. *See* SSR 06-03p; 20 C.F.R. § 404.1513(d) & 416.913(d).

capacity, and claimant's testimony was inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir. 06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the claimant could perform the requisite exertional demands, the ALJ's determination is not supported by substantial evidence).

The court further observes that in connection with her request for review before the Appeals Council, plaintiff submitted a March 18, 2010, medical report questionnaire completed by Dr. Hull. (Tr. 569-572). Hull indicated that Smith experienced marked or extreme limitations of functioning in her ability to walk, stand, bend at the waist, lift, reach, and climb. *Id*. This evidence constitutes part of the instant record – provided that it is new, material and related to the period before the ALJ's decision. *See Higginbotham v. Barnhart* 405 F.3d 332 (5th Cir. 2005); 20 C.F.R. § 404.970(b).[4] There is little question that the evidence satisfies the foregoing criteria;[5] thus, it serves to further erode the ALJ's residual functional capacity assessment.

### III.   Step Four and Remand

Because the foundation for the ALJ's step four (and alternative step five) determination was premised upon a residual functional capacity that is not supported by substantial evidence,

---

[4] *Higginbotham* cited *Perez v. Chater*, and *Wilkins v. Sec'y Dept. of Health Human Servs.* as support for its finding that post-ALJ evidence is to be considered part of the record. *See, Higginbotham*, 405 F.3d at fn. 3 (*citing inter alia*, *Perez v. Chater*, 77 F.3d 41, 44–45 (2d Cir.1996) and *Wilkins v. Sec'y, Dept. of Health Human Servs*., 953 F.2d 93, 96 (4th Cir.1991) (*en banc*)). Both *Perez* and *Wilkins* require that the subsequent evidence be new, material and relevant to the pre-ALJ decisional period. *Perez, supra*; *Wilkins, supra* (citing, 20 C.F.R. § 404.970(b)).

[5] Hull last saw Smith on January 29, 2010, – prior to the ALJ's decision. Moreover, the report was new and, as conceded by the Commissioner, inconsistent with the ALJ's residual functional capacity assessment. *See* Gov.'t Brief, pg. 4. The Commissioner suggests that Dr. Hull's March 2010 report is not a medical opinion entitled to any weight under the regulations. *Id*., at pgs. 4-5. Upon review, however, it is manifest that Dr. Hull's report addresses what Smith still can do despite her impairments, and therefore, is considered a "medical opinion." under the regulations. 20 C.F.R. 404.1527(a)(2).

the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, also is not supported by substantial evidence.

Plaintiff urges the court to enter a judgment awarding benefits for the relevant period. The courts have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g).  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.  *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).  The instant record is not so disposed.  Plaintiff's residual functional capacity assessment remains indeterminate.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the Commissioner's decision be **REVERSED** and **REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers at Monroe, Louisiana, this 31st day of January 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE